TIMOTEO ANGCO AND CIPRIANO ANGCO, MINORS, BY VICTOR FERIL ANGCO, THEIR UNCLE AND NEXT FRIEND, *v.* THE STANDARD OIL COMPANY OF CALIFORNIA.

No. 2031.

ARGUED NOVEMBER 27, 1931.                    DECIDED DECEMBER 8, 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.

This is an action brought by Timoteo Angco and Cipriano Angco, minors, who sue by Victor Feril Angco, their uncle and next friend, against the Standard Oil Company of California, a corporation. The action is for damages arising out of the death of the father of the plaintiffs, upon whom they claim they were dependent for support. It is disclosed by the evidence that Felix Angco, the father, died on June 19, 1930, as the result of having been struck, while standing on a public highway on the Island of Maui, by an automobile, the property of the defendant, and which at the time of the collision was being operated by one Reginald Warner, who was in the employment of the defendant as chief engineer on the steamship Lubrico, also owned by the defendant. The action is based on the alleged negligence of Warner in operating the automobile.

At the conclusion of the plaintiffs' case and after they had rested and after the defendant, without introducing any evidence, had also rested, a motion was made by the defendant for a directed verdict. This motion was granted and a verdict was accordingly returned in favor of the defendant and against the plaintiffs. The case is here on a writ of error.

One of the errors assigned is: "The court below erred in that he ruled as a matter of law that the defendant's employee Warner was not acting within the scope of his employment as an agent of the defendant corporation, the Standard Oil Company of California, so as to make said company liable for his negligent acts when he, Warner, committed the negligent acts complained of."

Reginald Warner, who was called as a witness by the plaintiffs, testified that on June 16, 1930 (the date of the accident), he was employed by the defendant as chief engineer on the steamship Lubrico, which was at that

time anchored at Kahului on the Island of Maui; that he remembered the accident in question and that he was at the time driving the automobile and was going towards the ship. When he was asked the question, "And you were going, were you not, to the steamship 'Lubrico,' " he answered, "We were going towards the steamship. I think we were going to stop and eat in Kahului first." He was then asked if he had not already testified that he was going to the steamship. He answered, "Yes," and then he was asked, "And you were, were you not?" to which he answered, "Not direct. I asked the captain if he wanted to eat, and he said 'When we get down there we will see.' " He was then asked, "And before going to sea you expected to eat in Kahului?" and answered, "Yes," and that aside from this he was on his way to the boat. He was then asked whether his duties on the boat would have to do with whatever the usual duties of the chief engineer are on a steamship, to which he answered, "Yes." He was then asked the following questions, to which he gave the following answers: "Q The boat was going to sea that night? A Yes. Q Captain Daniels was with you at the time? A Yes. Q He is the captain of the boat? A Yes. Q And the boat would go to sea under his command? A From the outside of Kahului harbor." On cross-examination the witness testified that as chief engineer of the steamship Lubrico he had no duties on shore at Kahului on the night or afternoon of June 16, 1930; that at the time he was driving the automobile he had not come from performing any duties for the Standard Oil Company and at the time he was driving the car he was not performing any duties for said company; that he was driving down to have a sandwich before going on the boat; that he had been chief engineer for several years and during that time had been in the employment of the defendant. At this juncture the following occurred:

"The Court: The court would like to ask a question in view of the line of examination taken, in anticipation of being called upon to make rulings in the matter. When you went ashore did you go ashore in connection with being under orders from anybody having a right to give you orders, or were you on shore that night? A Whenever I go on shore I can go as I please. The Court: Did anyone order you to go ashore in connection with the boat? A No. The Court: In connection with driving the automobile that night did anyone give you any orders in connection with driving the car? A No. The Court: Did anyone give you any orders as to where you should go? A No. The Court: At the time of the accident were you under orders of any superior, orders of anyone on the boat? A No, I just asked him if he wanted to eat. The Court: At the time you got in the car to go back to the boat the captain was with you? A Yes. The Court: Did the captain give you any orders as to returning to the boat and resuming your duties at that particular time? A No, sir. The Court: Were you performing any task or errand on behalf of the captain? A No, sir. The Court: When did you leave the 'Lubrico' to come ashore? A Between 2:30 and 3 o'clock. Q The Court: At that time were you on any errand connected with the boat? A No, sir. The Court: Were you in company with the captain under his orders to accompany him? A No, sir, I went there mostly with Mr. Burns to play golf. The Court: A pleasure trip? A Yes. The Court: When were you due back on the boat? A I asked the chief officer when he would be ready to go and he said between 9 and 11, so I thought to get back about 7:30. Mr. Pittman" (for defendant) "Q When you are on shore has anybody got any power over you at all or can they give you any authority at all? A No, I might respect his position and do a thing or two, but he has

no authority. Mr. Pittman: Q Has anybody on the ship any authority over you when you are on land off the ship? A No, sir. * * * Direct examination (continued) By Barry S. Ulrich, Esq." (for plaintiff): "Q It was your duty, was it not, to be back on the boat in time to sail? A Yes. Q And of course you say you are on your own more or less while you are ashore but the agents of the company have the right, have they not, to indicate to you when the boat would sail; that is, if they decided to sail earlier you would have to appear on the boat. I mean the persons in authority were so in authority of that vessel? Mr. Wild: I object as purely speculative. There is no showing that boat changed its schedule that night. They were to sail at 9 and they proceeded back at 7:30. It is purely speculative. (Argument) The Court: The court will assume that a man on the boat if and when notified to return at an earlier time, if he wants to keep his job, would have to come back, but there is no showing there was any call to return earlier. Objection sustained. Q In other words, it was your duty to be on the boat in time to sail? A Yes. (Cross-examination waived.)"

The plaintiffs then offered, and the court received, in evidence an ordinance of the County of Maui relating to speed limits in residence districts. This concluded the testimony. Thereupon the defendant made a motion for a directed verdict, one of the grounds being that the plaintiffs' evidence showed affirmatively that Warner was not acting in the course or scope of his employment or upon the business of the defendant at the time of the accident. Before the motion was acted upon the plaintiffs (through counsel) moved that the court reopen their case and permit them to put on further evidence. At this point, upon the request of the court that he be more specific as to what proof he offered to make, Mr. Ulrich

continued: "We offer to prove by Mr. Burns that he did authorize Mr. Warner to take the car for the purpose of driving himself and the captain down to resume their duties on the boat. We offer to show that at first he said he would take them down himself, but later said he had a social engagement and they should take the car and leave it at the wharf and he would pick it up there later. We offer to prove Mr. Burns was the agent and representative of the Standard Oil Company on the Island of Maui, with general authority to attend to all the necessary details of the business of that company on the Island of Maui having to do with the conduct of the business with reference to the disposition of merchandise on Maui and with reference to the necessary details concerning the despatch of the company's business."

The defendant objected to the granting of the motion on the ground that Burns, the proposed witness, had been in attendance, at the request of plaintiffs' counsel, during the trial, but, at the conclusion of the evidence, had returned to Maui. During the argument of the motion the court asked Mr. Ulrich the following question: "Do I understand that your offer means to prove that Mr. Burns in his office as an official of the company was requested to use the company's automobile for any other purpose than the conveyance of the captain and the engineer in returning from their holiday to their duties on the boat?" In answer to this question Mr. Ulrich replied: "In this particular instance he authorized the use of the automobile for the company's purposes in getting the men back to the boat." The court then asked the following question: "Was there any other company's business of any kind connected with your offer of proof that Mr. Burns was requested or concerned with furthering than the matter, whatever inference may be drawn from it, of assisting these two men in returning to the

boat?" to which Mr. Ulrich replied: "That's all." The following colloquy then occurred: "Mr. Wild: From the offer of proof, as it now appears, it would not change the court's ruling, and counsel has in everything he contends to be a fact. Mr. Ulrich: If it will be admitted, as a matter of record, that Mr. Burns authorized the use of this car for the purpose of getting the men back to the boat, and further admitted that Mr. Burns is a representative of the Standard Oil Company on Maui. The Court: I understand the extent of opposing counsel's admission is that Mr. Burns is distributing and sales manager of Standard Oil Company products on the Island of Maui, having no supervision or control over the movement of the boats. Mr. Wild: That is an accurate statement. The Court: And automobile in question, Mr. Burns was under no orders or requests on company business other than could be inferred by your argument that the return of the men from their holiday in some way benefited and expedited the company's affairs as to the boat. Mr. Wild: We will admit that. The Court: Well, then it is not necessary to make the offer, and I deny the motion."

Since the trial court did not base its refusal to allow the plaintiffs to reopen the case and to make the proof which they offered to make on the ground that the offer was not sufficient or that under the circumstances it came too late, but solely on the ground that the proof, if made, would not alter the legal status of the parties, we will pass the question of whether it was an abuse of discretion to deny the motion without comment and treat the case as though the proof had been made.

The first contention of the plaintiffs regarding the action of the trial court in directing a verdict for the defendant is that under the evidence it was a question for the jury to decide whether Warner at the time of the accident was returning to the "Lubrico" for the pur-

pose of meeting an emergency in the defendant's business, and if he was returning for such purpose, he was, as a matter of law, engaged in the defendant's business and the defendant would be liable for his negligence. The trouble with this contention is that it is entirely unsupported by the evidence. The testimony of Warner, which is uncontradicted and which was vouched for by the plaintiffs, he having been called as a witness by them, shows that when he left the "Lubrico" between 2:30 and three o'clock on the afternoon of June 16 to play golf he was informed by the chief officer that the boat would sail between nine and eleven o'clock that night and that he (Warner) "thought to get back about 7:30." This is the evidence and the only evidence upon which the plaintiffs rely to establish an emergency. It falls far short of the mark. It has no tendency whatever to show that the necessities of the defendant's business, in any of its aspects, required Warner to return by 7:30 o'clock or at any definite hour before the boat sailed. It only shows that he knew the hours within which the boat would sail and that he intended to return to it by a certain time. Whether he intended to do this because of some duty which he as chief engineer was required to perform in connection with the departure of the boat or whether he merely preferred, for his own pleasure or convenience, to spend the time intervening between 7:30 and the hour of sailing on the boat or in its vicinity does not appear. The jury was very properly not permitted to speculate about this.

In order to hold the defendant liable on the theory of an emergency it was necessary for the plaintiffs to introduce substantial evidence, amounting to more than a scintilla, that such a condition existed. Not having done this the contention now under consideration cannot be sustained.

The plaintiffs also contend that irrespective of whether

there was evidence of an emergency defendant is nevertheless liable because Burns, the defendant's agent on Maui, authorized Warner to use defendant's automobile as a means of returning to the boat. This contention cannot be sustained unless it can be said that in returning to the boat from his game of golf Warner was engaged in the defendant's business. The court below took the view that under the evidence he was, as a matter of law, not so engaged and directed a verdict accordingly.

It is argued on behalf of the plaintiffs that under the evidence this was a question of fact for the jury to decide and therefore the action of the court in withdrawing it from the jury was erroneous. In support of this argument the familiar rule, that if the automobile causing the accident belongs to the defendant and is being operated at the time of the accident by one of the regular employees of the defendant there is a reasonable inference that at such time he was acting within the scope of his employment and in the furtherance of the master's business, is invoked. This rule, however, is subject to an exception which is as firmly established as the rule itself, this exception being that when the evidence, which is uncontradicted and unimpeachable, shows that the employee was engaged in the pursuit of his own business or pleasure, the inference recognized by the rule disappears and the employer, as a matter of law, is not responsible for the results of his employee's negligence. The books are full of cases in which courts have applied either the rule or the exception, according to the facts presented.

The plaintiffs have directed our attention to several cases in which the rule was adopted and the exception rejected. One of these is *Casteel* v. *Yantis-Harper Tire Co.,* 36 S. W. (2d) 406, 408. In this case the plaintiff, while standing in the safety zone at Eleventh street and Garrison avenue in the city of Fort Smith, was struck

by an automobile, the property of the defendant, which was being driven by an employee of the defendant who had been such for several years. It appears from the opinion of the court that the testimony on the part of the defendants was "to the effect that, although Tolliver had been employed by Yantis-Harper for several years, he was paid by the day, and was only paid when he worked, and that he was not employed or paid on the day of the injury. Tolliver testified that he was not employed on this day, and the cashier and timekeeper of Yantis-Harper gave testimony to the same effect, as did other employees. Their testimony was to the effect that shortly before the collision Tolliver was loaned the use of one of Yantis-Harper's cars for the sole purpose of permitting Tolliver to go to his own home to get a raincoat which he wanted for his own use because it was raining, and that the use of the car had no relation whatever to any service performed for Yantis-Harper or in connection with their business by Tolliver, and had no relation to any duty on Tolliver's part as an employee, and that, indeed, he was not an employee at all on that day." The court, in commenting on this testimony, said : "There are contradictions in the testimony of these witnesses, which prevent us from so holding, as a matter of law, and we are unable also to say, as a matter of law, that no bias on their part was shown. In the case of *Skillern* v. *Baker*, 82 Ark. 86, 100 S. W. 764, 765, 118 Am. St. Rep. 52, 12 Ann. Cas. 243, Mr. Justice Riddick said : 'It may be said to be the general rule that where an unimpeached witness testified distinctly and positively to a fact, and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to by the witness can be drawn, the fact may be taken as established and a verdict directed based as on such evidence. But this rule is subject to many exceptions, and, where the witness is

interested in the result of the suit or facts are shown that might bias his testimony, or, from which an inference may be drawn unfavorable to his testimony, or against the fact testified to by him, then the case should go to the jury.' "

In the case at bar there is no contradiction of Warner's testimony, nor is it susceptible of any other inference, that his sole object in using the defendant's car was to return from the place where he had been playing golf to the boat on which he was the chief engineer. The *Casteel* case is essentially different in its facts from the instant case and therefore is not a precedent which supports the plaintiff's argument.

In *Ackerson* v. *Jennings Co.*, 107 Conn. 393, also cited by the plaintiffs, the defendant was in the business of selling, repairing and rendering service for automobiles, having its main establishment in Bridgeport and branches in several Connecticut cities, including one in Stamford. One Wilcox was general manager of the Stamford branch and as such had direct supervision of the conduct of the business of that branch, including the sale and service of cars and general control of defendant's employees connected therewith. One Root was service manager at the Stamford branch, having charge of all repair work, of the stock room and of the servicing of cars, and had direct supervision of the men employed in that department. Root's immediate superior, from whom he took orders, was Wilcox. On December 24, 1926, each of the employees of the Stamford branch received an invitation, written on the stationery of the defendant company and signed by Wilcox, reading as follows: "You are cordially invited to be my guest at a dinner to be held on the evening of January 8th, 1927, as a token of my appreciation of your services rendered for the company and myself." At an appointed hour most of the employees met at the office

and were transported in two cars belonging to the defendant, and driven by Wilcox and Root to an inn, some distance away, where the dinner was served. Root testified that Wilcox asked him to take a car and transport two of the men in his department and said that he (Wilcox) would transport the others. At the conclusion of the dinner Root took the same two men into the same car in which he had taken them to the dinner and while on the return journey the car, through the negligence of Root, left the road and collided with two poles, as a result of which Ackerson, one of the men riding with him, was killed and the other, Hunt, seriously injured. At the dinner Wilcox made a speech regarding the desirability of closer relations and consultation between the employees and himself, urging them that if any had grievances they should talk them over with him instead of keeping them to themselves. Wilcox testified that he gave the dinner on his own initiative and at his own expense to show his appreciation of a Christmas gift that had been given to him by the employees. Speaking of the effect of this testimony the court said (pp. 397, 398): "We think, however, in view of the statement of the purpose contained in the invitation and the above mentioned discussion at the dinner, that the jury might reasonably have found that the occasion was intended principally if not solely to promote legitimate and important interests of the defendant's business, viz., harmony, cooperation, and good will among the employees of the Stamford branch and between them and Wilcox as defendant's representative, and within the scope and implied authority of Wilcox, as its manager, acting in behalf of the defendant. Any secret intention of Wilcox which none of the employees knew or inferred could not be held to characterize the purposes of this occasion. * * * If Wilcox had, at the time and place, instructed

Root to take one of defendant's cars and go to the relief of a disabled automobile out upon the road, no question could be made as to defendant's liability for consequences of Root's negligence while so engaged. If, as we think, the jury might have found, not unreasonably, if they believed all the testimony adduced by the plaintiffs, and adopted the inferences properly to be drawn therefrom, the trip upon which Root was engaged was, perhaps not so obviously but none the less truly, in the same category, a like result would follow. If, on the other hand, the jury concluded that the expedition was a personal entertainment by Wilcox of the employees of the company as his guests in return for the present which had been made to him and that such references as were made to the conduct of the business of the company were merely incidental and such as would naturally be discussed in a meeting of its employees, the occasion would not be within the apparent scope of Wilcox's authority as representing the defendant, and it would not be liable."

It is apparent that there is a material, factual difference between this case and the case at bar. If Burns had directed Warner to use the defendant's car as a means of transporting him to some place on the Island of Maui, where he was to participate in an enterprise instigated by Burns for the defendant's benefit, and, after the completion of the enterprise, Warner had used the car to return to the boat and in doing so had negligently killed plaintiffs' father, the cited case might be applicable. There is not a scintilla of evidence, however, to establish any such situation. Warner, according to the undisputed testimony introduced by the plaintiffs themselves, had, by some means not disclosed by the evidence, gone from the boat to a place on Maui to play golf, an enterprise wholly unconnected with the defendant's business. When he was ready to return to the boat Burns authorized him to use

the defendant's car for that purpose and that purpose alone.

In the *Ackerson* case, as we have just noticed, the court was of the opinion that if the dinner was given by Wilcox to the defendant's employees for the purpose of showing his appreciation of the gift they had made him and the references by him in his speech to the company's business were merely incidental the defendant would not be liable for the negligence of Root which caused the death of Ackerson and the injury to Hunt. Under this principle it was not within the scope of Burns's agency to authorize Warner to use the defendant's car for the purpose of returning from an undertaking in which the defendant had no concern and from which it derived no benefit but which was solely for Warner's own pleasure and benefit.

Our attention is also called to *d'Aleria* v. *Shirey*, 286 Fed. 523, which case was decided by the ninth circuit court of appeals. The defendant, together with Armand d'Aleria (to whom she was not at that time married, but to whom she was subsequently married), arrived at a hotel in San Francisco at eleven o'clock at night in an automobile, the property of the defendant. The defendant went into the hotel and left d'Aleria to take the automobile to the garage where it was usually kept. Twenty minutes later a collision occurred while the automobile was being driven by d'Aleria and as a result the plaintiffs were injured. d'Aleria, who was called by the defendant and who was the only witness as to what occurred from the time he left the hotel until the accident, testified that the defendant told him to take the automobile to the garage and that he replied that he would first call at a certain music store to see the music publisher and that he did make the call and that thereafter he picked up a friend whom he intended to take to the Fairmont Hotel, and that

while he was about to do so the accident occurred. The defendant moved for an instructed verdict in her favor, which was denied. The trial resulted in a verdict and judgment for plaintiffs. On appeal the only assignment of error was the refusal of the court below to grant the motion for an instructed verdict. The appellate court held that there was no error. In giving its reasons for this conclusion the court said: "The plaintiff in error relies upon the doctrine that for a negligent act done by a servant the master is not liable, unless the act was done at a time when the servant was engaged in his master's business. The evidence sufficiently shows that d'Aleria, although not engaged as a chauffeur by the plaintiff in error, sustained such relation to her that, in returning the automobile to the garage, he acted as her servant. He had been employed by her as a musician. He had, as the evidence clearly indicates, acted as her agent in going to the garage to get the automobile for her, and driving it for her, and in returning it to the garage after she had used it. He had no means with which to respond in damages, and it is obvious that both he and she had every incentive to relieve her from responsibility for the results of the accident. Prima facie, the plaintiff in error was liable for the negligent act of d'Aleria, for the collision occurred from the negligent driving of an automobile belonging to the plaintiff in error, and driven by her servant. The jury were not bound to believe all the testimony that was offered on behalf of the plaintiff in error to overcome that presumption. As to the instructions under which the automobile was placed in the charge of the driver, the testimony of the two parties who alone knew of the facts differed. What was done with the automobile, during the ensuing twenty minutes, the driver alone knew. The jury were not bound to believe that he picked up a friend

en route or that, if he did, he intended to go elsewhere than to the garage. There was no corroboration of the driver's testimony by the person who, he said, was with him at the time of the accident, and there is nothing in the record to corroborate the driver's evidence that such a person was with him at that time. The jury may have believed that the errand of d'Aleria to a music store on Market street was an errand on behalf of the plaintiff in error. She did not testify that it was not. If a servant, while about his master's business, makes a deviation of a few blocks for ends of his own, the master is nevertheless liable."

Again we have such a dissimilarity in facts as to render the cited case inapposite. In the *d'Aleria* case the plaintiffs were in a position to challenge the truth of Armand d'Aleria's testimony and to ask the jury, for obvious reasons, to disbelieve it. The plaintiffs in the instant case are in no such position. The evidence introduced by them, which was uncontradicted, inferentially or otherwise, proves conclusively that the only purpose for which Warner was using the defendant's car was to return from the pursuit of his own pleasure to the defendant's boat, where his activities as the defendant's employee were to be resumed.

Plaintiffs cite many other cases which we think are likewise inapplicable to the case before us.

This case presents the naked question of whether the negligence of an employee of a corporation, in the operation of an automobile, the property of the corporation, which was furnished him by the general agent of the corporation for the sole purpose of returning from a personal enterprise, in which he had been engaged, to the place of his employment, where there was no emergent need of his services, is imputable to the corporation. We know of no judicial precedent requiring an affirmative

answer to this question. Warner was no more acting for the defendant on his return from the golf links to the boat than he was acting for it while going from the boat to the golf links. In the one instance he was leaving the scene of his employment and going in search of personal recreation and pleasure, and in the other he was returning to his employment. In both instances he was acting in a personal and not in a representative capacity. Nor does it make any difference that in the latter instance the car that he used was furnished him by the defendant's agent on Maui. This agent had no more power within the limits of his agency to involve the defendant in Warner's negligence by authorizing him to use its car for the purpose of returning to the boat than he had to so involve it if he had authorized its use by Warner for the purpose of going to the golf links.

For the foregoing reasons it is our conclusion that the defendant's motion for a directed verdict was properly granted. The judgment therefore is affirmed.

*A. W. A. Cowan* (*Ulrich & Hite* on the briefs) for plaintiffs in error.

*C. A. Gregory* (*Smith & Wild, Smith, Warren, Stanley & Vitousek* and *W. B. Pittman* on the brief) for defendant in error.